ALEXANDER H. IRVIN

*v.*

NASHVILLE, CHATTANOOGA AND ST. LOUIS RAILWAY CO.

1. PARTNERSHIP—*when it does not exist.* Where there is no joint expense, no joint property, no joint fund, no joint losses, no joint profits and no arrangement to share loss and profit, there is no partnership. A communion of profit is of the very essence of the contract of partnership, for without this communion of profit, a partnership can not, in contemplation of law, exist.

2. Where there was an arrangement between different railroads connecting with each other whereby each road agreed to carry the cars of the others having the name "Green Line" painted thereon, over its own road, without breakage of bulk, at such rates as might be agreed on, each company fixing its own rates of freight passing over its own road and collecting the same as the freight passed over its road, and having no interest in freights not reaching its road, each road desirous of making a through rate over other roads *via* these Green Line cars, would ascertain the rates the intermediate road or roads charged, and, adding the same to its own rates, fix its own schedule of through rates, which it termed "Green Line Rates," and there was no joint expense or loss or profit, except that where a loss could not be located on any particular road a *pro rata* share of the loss was borne by all that carried the freight, it was *held*, there was no partnership as between the different roads.

3. ESTOPPEL. And where there was an arrangement like the foregoing, the fact that the words "Green Line" were painted on the roof of a wharf-boat, and were also printed at the top of the bills of lading, the name of the railroad company being also printed on the bills of lading, would not estop such railroad company from denying there was such a partnership.

WRIT OF ERROR to the Circuit Court of Alexander county; the Hon. DAVID J. BAKER, Judge, presiding.

Mr. SAMUEL P. WHEELER, for the plaintiff in error, in support of the proposition that a partnership did exist in this case, cited *Champion* v. *Bostwick*, 11 Wend. 571; 18 id. 175; *Fairchild* v. *Slocum*, 19 id. 329; *Nashua Lock Co.* v. *The Worcester and Nashua Railroad Co.* 48 N. H. 339, and cases there cited.

Messrs. GREEN & GILBERT, for the defendant in error, after reviewing the authorities cited in behalf of the plaintiff in

error, argued that it is contrary to reason, principle and authority to hold that an intermediate carrier, who has neither specially contracted for the transportation of goods, nor received, nor lost them upon its own road, is responsible either as an implied partner or even joint contractor, simply because it is one of a series of connecting roads carrying through freights upon an agreed rate divided between the several connecting roads proportionate to actual separate haul, or service of each road, upon its own line and at its own expense, citing *Darling* v. *B. W. & W. R. R. Corp.* 11 Allen (Mass.) 295; *Crofton* v. *Baltimore and Ohio Railroad Co.* 1 MacArthur, 492; *Hartan* v. *Eastern Railroad Co.* 114 Mass. 44; *Elsmore* v. *The N. R. R. Co.* 23 Conn. 457; *Perkins* v. *P. S. & P. R. R. & Transp. Co.* 33 id. 116; *Converse* v. *N. & N. Y. Co.* 47 Maine, 573.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was an action of replevin, by the Nashville, Chattanooga and St. Louis Railway Company, against Alex. H. Irvin, to recover possession of a wharf-boat, claimed by the former as its property, and which had been seized by the latter, as sheriff, under certain writs of attachment issued against " Green Line," as the property of " Green Line." The declaration contained the usual counts in *cepit* and *detinet;* and the pleas, whereon issue was joined, were *non cepit, non detinet,* property in defendant, property in " Green Line;" also a plea that defendant, as sheriff, took the wharf-boat as the property of " Green Line," by virtue of said writs of attachment, and that the same was the property of " Green Line," and subject to levy, etc.

The cause was tried by the court below without a jury, who found the issues for the plaintiff and gave judgment accordingly. The defendant brings the case here by writ of error, and asks a reversal of the judgment upon two grounds, viz:

First, that under the attachment laws of Illinois, suits may be brought against joint defendants by such names, styles or titles as they are usually known; that the writs of attachment,

by virtue of which the wharf-boat was levied on, and under which defendant justifies, were against "Green Line;" that "Green Line" was the name and style of a partnership composed of a number of railroads, of which plaintiff was one; and that, as the individual property of each copartner is liable for the firm debts, the plaintiff's wharf-boat was subject to the attachments.

Second, that plaintiff suffered "Green Line" to have possession, and exercise control over the wharf-boat in such a way and to such an extent as to estop a denial of ownership in "Green Line."

It appears, from the record, that the cause of action upon which the writs of attachment in question issued against "Green Line," was loss of grain delivered to one W. T. Osburn, agent, Cairo, Illinois, in February, 1873, under and in pursuance of certain bills of lading by him executed, "to be transported from Cairo, Illinois, to the wharf-boat at Hickman, Ky., on board the good steamboat called Glasgow, (the dangers of river, collision, explosion and fire excepted,) thence by the N. & N. W., and N. & C. railroads, and connecting railroads, (subject to the conditions of their several freight regulations) to be delivered, etc.,"—to certain consignees named, at Columbus, Ga., and other points south— "he or they paying freight at the rate" in the bill of lading specified; which was a certain fixed sum per 100 lbs. At the top of the bills of lading was the heading "Green Line," and there also appeared the words "Through rates to," etc., there then following twenty-five enumerated places in different southern States, some one of which was the place of destination named in the bills of lading.

At the time these bills of lading were executed by Osburn, the Nashville and Chattanooga Railroad Company, (now Nashville, Chattanooga and St. Louis Railway Company, and plaintiff in this suit,) owned and was operating its road, the Nashville and Chattanooga Railroad, from Chattanooga to Nashville; and the Nashville and Northwestern Railroad Company owned

and was operating its road, the Nashville and Northwestern Railroad, from Nashville to Hickman, Ky., on the Mississippi river; and the steamboat Glasgow was engaged in transporting freights from Cairo to Hickman, for shipment *via* the Nashville and Northwestern road.

It does not clearly appear whether she was in the employ of the Northwestern Railroad Company, or ran independently. It does, however, appear that she was not in the employ of the Nashville and Chattanooga Railroad Company. The grain in question was lost about the 8th day of February, 1873, by the steamboat Glasgow, by the sinking of her barge, Eliza, the boat never having reached Hickman. The proof is, that Osburn, who signed the bill of lading as agent, was the agent of the Nashville and Northwestern Railroad Company, employed and paid by that Company, and that he never was agent for the Nashville and Chattanooga Railroad Company, and had no authority from that company. Prior to and at the time of the execution of the bills of lading and loss of the grain in question, the Nashville and Chattanooga Railroad Company had no agent at Cairo, nor had it done business there; and the wharf-boat in question, built and owned by that company, was then, and had been since its receipt from the builders in November, 1872, used by that company at Johnsonville, on the Tennessee river, and in the possession of one Capt. James F. Miller as its agent. About a month after the loss of the grain in question, the Nashville and Chattanooga Railroad Company on March 1, 1873, transferred its said wharf-boat from Johnsonville to Cairo. It was brought to Cairo in charge of Capt. Miller as agent of the Nashville and Chattanooga Railroad Company, who continued in its possession until its seizure under the attachments in question.

The Nashville and Chattanooga Railroad Company having purchased the Nashville and Northwestern Railroad, on the 30th day of May, 1873, by the decree of the chancery court of Davidson county, Tenn., had its corporate name changed from Nashville and Chattanooga Railroad Company to the Nashville,

Chattanooga and St. Louis Railway Company. There is noth-
ing showing any consolidation of the Nashville and North-
western Railroad Company and Nashville and Chattanooga
Railroad Company under the new name, nor any assumption
of the debts or liabilities of the former company. Miller,
after his arrival at Cairo, only did the business of the Nash-
ville, Chattanooga and St. Louis Railway Company—he was
its agent at Cairo and paid solely by it and none other.
Miller issued no bills of lading until Osburn left. He
then, as agent for and on behalf of the Nashville, Chat-
tanooga and St. Louis Railway Company, commenced and
continued to receive freights on board of that company's wharf-
boat and execute bills of lading therefor, similar in form to
those before issued by Osburn, up to and after the seizure of
the wharf-boat under the attachments. After Miller came to
Cairo, the words Green Line were painted on the roof of the
wharf-boat; but Nashville, Chattanooga and St. Louis Railway
was also painted on the sides of the wharf-boat, like as the
cars of the different roads have the name of the road they be-
long to on the end of the car, and Green Line on the sides.

As respects " Green Line," the testimony is that there is no
such organization as Green Line; that the words simply de-
signate a route that the freights were to go without breaking
bulk, at a through rate, over a good number of roads. There
was an arrangement between different railroads, plaintiff being
in the arrangement, whereby each road agreed to carry the
cars of the other having the name "Green Line" painted
thereon, over its own road without breakage of bulk, at such
rates as might be agreed on, each company fixing its own rates
of freight passing over its own road, and collecting the same
as the freight passed over its road, and having no interest in
freights not reaching its road. Each road desirous of making
a · through rate over other roads *via* these Green Line cars,
would ascertain the rates the intermediate road or roads
charged, and adding the same to its own rates, fix its own
schedule of through rates, which it termed " Green Line rates."

It would then ship by these rates, executing its own bill of lading.

There appears, however, some confusion in the testimony as to fixing rates, there being evidence that there is a committee for making Green Line rates, which met every month; but there is also distinct evidence that each road makes its own tariff to ship by Green Line rates to destination. There is no joint expense, each road hiring and paying its own agents, and operating its own road at its own expense; no joint property; no joint fund; no joint losses; no joint profits; no arrangement to share loss or profit,—each road on which any loss occurs pays it,—the only exception as to not sharing in loss being when a loss can not be located on any particular road, then a *pro rata* share of the loss is borne by all that carry the freight. And there seems to be an agent for adjusting such loss,—the only case of there being any joint agent employed, excepting, perhaps, a committee for fixing rates.

We are of opinion that the court below was justified, from the evidence, in finding that the arrangement among these railroad companies created no partnership or joint liability as between the roads themselves, or as to third persons. There was no community of interest, no community of profits and losses, but all was several. Story lays it down, that a communion of profit is of the very essence of the contract of partnership; "for without this communion of profit a partnership can not, in the contemplation of law, exist." Story on Part. § 18.

Sometimes the arrangements of adjoining routes have been held to constitute a partnership, where they have put their earnings into a common fund and divided according to the length of their respective lines, and as in the case cited by defendant's counsel, of *Champion* v. *Bostwick,* 18 Wend. 175, —a case of an agreement for running a continuous line of stages. But it was there expressly said: "The case would be entirely different if each stage owner was to receive and retain the passage money earned on his part of the line, and

to sustain all the expenses thereof, and was only to act as agent of the others in receiving the passage money for them for the transportation of passengers over their parts of the line. In that case there would be no joint interest, and no liability to third persons as partners."

In *Darling* v. *Boston and Worcester Railroad Corporation*, 11 Allen, 295, it was decided: If an arrangement is made between several connecting railroad companies, by which goods to be carried over the whole route shall be delivered by each to the next succeeding company, and each company so receiving them shall pay to its predecessor the amount already due for the carriage, and the last one collect the whole from the consignee, a reception of such goods by the last company, and a payment by it of the charges of its predecessors, will not render it liable for an injury done to the goods before it received them; that such an arrangement created no partnership or joint liability; and that it would not, if further arranged that each line should charge only a stipulated rate of freight, so that any customer could be informed beforehand what the amount of freight would be to the place of destination.

So, also, in *Hartan* v. *Eastern Railroad Co.* 114 Mass. 44, it was held, that an agreement between railroad corporations operating connecting lines as to the division of through ticket money, and as to the sale of through tickets enabling passengers by the payment of a single fare to pass without change of cars from a point on one road to a point on the other, does not make the corporation selling a through ticket liable for an injury sustained by the purchaser upon the road of the other corporation,—that no community of interest, of obligation or of responsibility results from such agreement. This case, in the respect of liability from selling a through ticket, is apparently somewhat in conflict with *Illinois Central Railroad Co.* v. *Copeland*, 24 Ill. 332, where it was held, that a railroad corporation selling through tickets over its own and other roads is liable for the safe carriage of passengers and baggage to the place of destination. But a contract for such liability

was there held to be implied from the mere sale of a through ticket; and the decision does not militate against the former case in the respect of the holding that a joint liability among the several roads did not result from such an express agreement as was there made.

The connection in business, here, of the several railroad companies was hardly beyond the extent of securing a continuous passage of freight over the different lines of road without breaking bulk, and as before remarked, we do not regard it as sufficient to create a partnership or joint liability. And see, also, *Merrick* v. *Gordon*, 20 N. Y. 93.

The second ground of alleged liability, that the plaintiff so acted with respect to the wharf-boat as to estop a claim of ownership therein, we regard as equally untenable. The chief ground for such claim of estoppel is the fact that the words Green Line were painted on the roof of the wharf-boat, and were printed at the top of the bills of lading; but there were also painted on the sides of the wharf-boat the words, Nashville, Chattanooga and St. Louis Railway, so that, as being indicative of ownership, it is not seen why the latter words would not neutralize the effect of the former. The words Green Line might denote that there was a running connection of some kind among the different roads, but would not indicate it to be of such a character as to amount to a partnership or create a joint responsibility. Any one, in relying upon such an arrangement as the latter, would properly have been put upon inquiry in respect thereto; and any reasonable inquiry would have readily ascertained the connection that in fact existed. There is nothing in the case of any actual representations as to ownership or joint liability upon which to base defendant's claim.

The judgment of the court below will be affirmed.

*Judgment affirmed.*