# J. P. CROCKETT, Respondent, v. ST. LOUIS & HANNIBAL RAILWAY COMPANY and WABASH RAILROAD COMPANY, Appellants.

St. Louis Court of Appeals, February 1 and March 8, 1910.

1. **COMMON CARRIERS: Negligence: Carriage of Freight: Pleading: Joinder of Carriers.** In an action against an initial and a connecting carrier for damages sustained by negligent delay in the transportation of freight, the averments in the petition of co-partnership between the carriers might be considered as superfluous and the action treated as one seeking recovery alone on section 5222, Revised Statutes 1899, which holds the initial carrier responsible to the shipper for damage imputable to the negligence of any carrier participating in the transportation, unless the first one absolves itself from liability beyond its own route by agreeing to transport no further than its terminus; the statute in a case for negligent delay in transporting permitting two or more carriers engaged in the transportation of freight to be united as defendants, and a partnership among them or a joint undertaking by them to carry the particular freight not being essential to recovery.

2. ————: ————: ————: **Statutory Liability: How Limited.** Where in the main contracting clause of a bill of lading issued by a carrier for a shipment of freight, the carrier agrees to transport the freight from the station where it is received to destination, on the lines of a connecting carrier, the fact that subsequent clauses declare it agrees to carry to the end of its line only and there deliver to a connecting carrier would not prevent the contract from being an undertaking by the carrier for through carriage nor confine its liability for negligent losses to those occurring on its own line; but if in the main contracting clause the carrier agrees to carry the freight no further than the terminus of its line, its liability for negligent losses will be confined to such as occurred on its own line.

3. ————: ————: ————: **Joinder of Carriers: Necessity of Proving Negligence of Each.** In an action by a shipper against an initial and a connecting carrier for damages sustained by negligent delay in the transportation of freight, it becomes a condition of recovery against either carrier, under section 5222, Revised Statutes 1899, that he should adduce evidence tending to prove its negligence caused the loss.

4. ———: ———: ———: Connecting Carrier: Liability. Where, under a contract for a through shipment of freight, the initial carrier transported the freight to the end of its line and there turned it over to a connecting carrier, which in turn transported it to the end of its line and there turned it over to a third carrier, which carried it to destination, under an arrangement with the second carrier, by which a stipulated sum was paid it, the third carrier's relation to the shipment was that of agent either for both the other carriers or for the second alone, and while such third carrier was answerable to the shipper for its own torts, the other carriers were answerable for them too, or the second one was in any event.

5. ———: ———: ———: Joint Liability: Instructions: Failure to Define Terms. In an action against an initial and a common carrier for negligent injuries to freight en route, on the theory defendants were jointly liable because of a partnership agreement between them, the court instructed that, to make defendants jointly liable for negligent injuries to freight en route, they must each have been common carriers, and must have agreed to associate themselves together and form, as to the shipper, a continuous line between the point of shipment and final destination on the line of the terminal carrier, and that the contract of shipment with the initial carrier was for carriage over its own and the connecting line for an agreed sum for the whole trip, which sum was divided between the two roads. *Held*, that the words "agreed to associate themselves together" were misleading, in that they were too indefinite to prescribe a test of a partnership or joint undertaking to ship the goods; not every association between carriers for through shipment being a partnership.

6. ———: ———: ———: ———: Partnership. An agreement by common carriers to charge through rates of freight from stations on the line of one to stations on the line of the other does not make them partners, nor necessarily bind both by contracts one of them makes; but if several common carriers having each its own line associate and form what to the shipper is a continuous line, and contract to carry goods through for an agreed price, which the shipper or consignee pays in one sum and which the carriers divide among them, then as to the three parties with whom they contract, they are liable for a loss taking place on any part of the whole line.

7. ———: ———: ———: ———: ———. If two or more carriers form a co-partnership for the transportation of freight over their respective lines, a contract made by one of them with the shipper will be the contract of all, at least in the absence of a stipulation to the contrary.

Crockett v. Railroad.

8. ——: ——: ——: ——: **Agency.** Though several carriers are not co-partners, one of. them may be empowered to enter into through contracts with shippers for the transportation of freight in behalf of all, and in that case each will be responsible for the defaults of all.

9. ——: ——: ——: **Liability of Connecting Carrier.** In the absence of a statute, the final carrier having a joint.traffic agreement with the initial carrier will not be responsible for the latter's negligence. in transporting freight, unless the former agreed either by force of a partnership between it and the other company, or otherwise, to carry the freight over the whole route.

10. ——: ——: ——: ——. Under an agreement by the final carrier to transport from the junction to final destination, its responsibility for losses would be limited to those happening after it accepted the property to be transported.

11. ——: ——: ——: **Joint Liability: Bill of Lading Construed.** An initial carrier received freight for transportation to a point on the line of a connecting carrier, under a joint traffic agreement by which the freight charge was prorated between them, the initial carrier having authority to issue through bills of lading to the point of destination. The bills of lading of two of the shipments in the main contracting clause provided the initial carrier agreed to transport the property to final destination over its own line and that of a connecting carrier, but a subsequent clause provided it should only be liable for damage occurring on its own line and while the freight was in its actual custody. The bills of lading for the other shipments in the main contracting clause provided the initial company should transfer the freight to the end of its line for delivery to the connecting carrier and that in continuing the shipment the latter was the agent of the shipper and not of the initial carrier and that the initial carrier should be liable only for damage occurring on its own line. *Held,* the bills of lading did not impose joint and several liabilities on each carrier for the whole route.

12. ——: ——: ——: ——: **Partnership: Constitutive Elements.** The existence of a joint traffic agreement between two carriers, by which authority is given each to issue through bills of lading from points on the lines of one to points on the lines of the other, with no stipulation for a division of profits and losses, but simply one for a prorating of the freight charges, and creating no right in each company to manage the entire business transacted by both between the points of shipment and destination, or community of property interests, does not constitute a partnership.

Crockett v. Railroad.

13. ———: ———: ———: ———: ———: Liability to Third Par-
ties as Partners. The facts stated would not warrant a shipper
as a reasonable man to deal with such carriers as co-partners,
where the bills of lading covering the shipment provided that
the initial carrier should only be liable for negligent losses
occurring on its own line and that the contracting carrier
transported the goods as agent of the shipper.

14. ———: ———: ———: Liability of Initial Carrier, Independent
of Statute. In the absence of a statute imposing liability, the
initial carrier would be prima facie answerable for injury to
freight shipped under a through bill of lading to a point on the
line of a connecting carrier, but might exonerate itself by
proving delivery of the freight in a reasonable time and in
good order to the next carrier.

On Motion for Rehearing.

15. ———: ———: ———: Connecting Carriers: Liability of
Last Carrier: Presumption. The presumption that the last of
several carriers which haul a consignment of freight is to
blame for damage occurring in transit does not apply to a case
where the negligence of the carrier is charged to have caused
the damage.

16. ———: ———: ———: Pleading: Negligence Must be Proved
When Pleaded. In an action against a carrier for loss or damage
to property shipped, where plaintiff avers the loss or damage
was caused by negligence, he must prove that averment in order
to recover.

17. ———: ———: ———: Connecting Carriers: Liability of Last
Carrier: Presumption: Statute. The presumption that the
last of several carriers which haul a consignment of freight
is to blame for damage occurring in transit does not apply in
actions on section 5222, Revised Statutes 1899, when negli-
gence is charged in the petition, as possibly it must always be
under the statute, since the redress allowed by it is confined
to losses caused by the negligence of the carrier.

18. ———: ———: ———: ———: Limiting Statutory Liability of
Initial Carrier: Bill of Lading Construed. A bill of lading
issued by an initial carrier which provides in the main con-
tracting clause that the carrier shall transport the freight to
the end of its own line only, for delivery there to a connecting
carrier, to be transported by the latter to destination as the
agent of the shipper and not of the initial carrier, and that
the initial carrier shall be liable only for loss occurring on its
own line, while the freight is in its actual custody, is not a
contract for through shipment.

19. ———: ———: ———: ———: Joinder of Carriers: Neces-
sity of Proving Negligence of Initial Carrier. In an action

against both an initial and a connecting carrier, under section 5222, Revised Statutes 1899, as amended by Laws 1905, p. 53, for negligent delay in the transportation of freight, in order to recover against the initial carrier it is necessary to prove the loss was due to its negligence, section 2870, Revised Statutes 1899, which allows contribution among defendants in tort actions having no application; that section applying only to defendants in a tort case who have been held liable as joint tort-feasors.

Appeal from Audrain Circuit Court.—*Hon. Jas. D. Barnett,* Judge.

Reversed and remanded.

*J. L. Minnis, Robertson & Robertson* for appellant, the Wabash Railroad Company.

(1)  The defendants are connecting carriers and not partners. Sec. 13, art. 12, Const. of Mo., sec. 5222, R. S. 1899; secs. 1122, 1132, 1134, 1138, 1139, R. S. 1899; Moore on Carriers, sec. 24, p. 491; McCann v. Eddy, 133 Mo. 59; Grain Co. v. Railroad, 176 Mo. 480; Hutchinson on Carriers, secs. 164-171; 6 Cyc. 478; Live Stock Co. v. Railroad, 87 Mo. App. 330; Shewalter v. Railroad, 84 Mo. App. 589. (2)  The evidence fails to show where any delay occurred, whether on the line of the initial carrier, the intermediate carrier, or the final carrier, and having failed to establish a joint liability as against the two defendants, there can be no recovery as against the intermediate carrier, this defendant. There was no evidence whatever as to any negligent handling of the stock or handling of the cars, but the court in the instructions given as to each count submitted the question to the jury as to the negligent handling of the hogs, and the failure to exercise ordinary and reasonable care for their safety and allowed a recovery for delay and negligent handling by which some of the hogs were killed or crippled. Before the plaintiff could be entitled to recover for crippled or dead hogs, he must establish by evidence that they

were given such rough handling as to injure or kill them. Schureman v. Railroad, 88 Mo. App. 183. Plaintiff's instructions allow the jury to allow for the crippled and dead hogs on mere conjecture that some wrongful act was committed and all of them on that point are erroneous. Cash v. Railroad, 81 Mo. App. 109; Paddock v. Railroad, 60 Mo. App. 328. To warrant a recovery by a shipper against a common carrier for damages to live freight, it is not sufficient for the shipper to show a delivery of the live freight to the carrier in good condition and its redelivery in a damaged condition, but he must further produce evidence tending to prove an injury by human agency causing or concurring to cause the loss. Hance v. Express Co., 66 Mo. App. 486.

*J. D. Hostetter* for appellant, St. Louis & Hannibal Railroad.

As to the shipments mentioned in the 3d and 4th counts in the petition, the initial carrier, the St. Louis & Hannibal Railroad Co., only contracted to transport the live stock to the end of its line and limited its liability to matters occurring on its own line. This it may lawfully do, as is settled by the rulings announced in the following cases, some of which are very recent ones. Western Sash & Door Co. v. Railroad, 177 Mo. 641; Jones v. Railroad, 115 Mo. App. 232; McLendon v. Railroad, 119 Mo. App. 128; Bank v. Railroad, 72 Mo. App. 82; McCann v. Eddy, 133 Mo. 59.

*J. O. Allison* and *P. H. Cullen* for respondent.

(1)   This action was instituted July 28, 1905. The amendment to section 5222, R. S. 1899, was then in force. Under this act suit may be brought against all connecting carriers in any county where any one of them might be sued. It stands confessed that

the Wabash may be sued in Audrain county, hence
the court had jurisdiction. R. S. 1899, sec. 5222; Ses-
sion Acts 1905, p. 94. (2) A corporation has no vested
right to be sued in any particular place and a change
in the place where suit may be brought pertains to
the remedy which the State provides for its citizens
and is at all times subject to modification and control
by the Legislature and the fact that the causes of action
declared on in this suit, arose before the amendment
of 1905 does not in any way preclude the bringing of
suit in Audrain county. Cooley's Const. Lim. (6 Ed.),
p. 450; Kick v. Doerste, 45 Mo. App. 134; In re
Garishe, 85 Mo. 469; Schuster v. Weiss, 114 Mo. 158;
Roenfeldt v. Railroad, 180 Mo. 554. (3) It is pro-
vided by our statutes that every person who shall have
a cause of action against several persons may bring
suit thereon jointly or severally against any of the
persons liable as he may think proper. R. S. 1899,
sec. 545; Hill v. Combs, 92 Mo. App. 245; Maddox v.
Duncan, 143 Mo. 613; Ess v. Griffith, 128 Mo. 50.
(4) Under the General Practice Act it is provided that
when there are several defendants and they reside in
different counties, the suit may be brought in any such
county. R. S., sec. 562; Davison v. Hough, 165 Mo.
561. (5) Under section 562 the principal residing in
one county and the agent residing in another may be
jointly sued. Stotler v. Railroad and Wiseman,
200 Mo. 107; Lanning v. Railroad, 196 Mo. 647;
Ess v. Griffith, 128 Mo. 50. Under the doctrine that
the connecting carrier is agent of the initial (which is
unquestionably true at least as to two counts in this
case), the two companies were jointly liable and suit
might be maintained against them in any county in
which either the principal or agent resided. (6) The
petition states a cause of action against the two com-
panies as connecting carriers and even if it did not
and a variance arose under the proof appellant cannot

complain because it failed to file an affidavit alleging variance. Ingwerson v. Railroad, 116 Mo. App. 139; Litton v. Railroad, 111 Mo. App. 140; Hensler v. Stix, 113 Mo. App. 162. (7) It is well settled that where several common carriers, each having its own line, associate and form what to the shipper is a continuous line, and contract to carry goods through for an agreed price which the shipper pays in one sum, and which the carriers divide among themselves, they are jointly and severally liable to the shipper with whom they have contracted for a loss taking place on any part of the whole line. Eckles v. Railroad, 112 Mo. App. 240; Wyman v. Railroad, 4 Mo. App. 35; Barrett v. Railroad, 9 Mo. App. 226; Cherry v. Railroad, 61 Mo. App. 303; Shewalter v. Railroad, 84 Mo. App. 589; Live Stock Co. v. Railroad, 87 Mo. App. 334; Champion v. Bostwick, 11 Wend. 571; Champion v. Bostwick, 18 Wend. 175; Pattison v. Blanchard, 1 Seld. 186; Cobb v. Abbott, 14 Pick. 289; Railroad v. Spratt, 2 Dwall. 4; Black v. Railroad, 139 Mass. 308; Hart v. Railroad, 8 N. Y. 37; Hutchinson on Carriers (3 Ed.), secs. 250, 251, 252, 253, 254 and 255; Weyland v. Wilkins, Holt N. P. 227; 1 Starkie 272; Laughter v. Pointer, 5 B. & C. 547; Carter v. Peck, 4 Sneed 203; Cobb v. Abbot, 14 Pick. 289; Fromont v. Coupland, 2 Bing. 170; Rocky Mt. Mills v. Railroad, 119 N. Car. 693, 25 S. E. Rep. 854, 56 Am. St. Rep. 682. (8) The rule is well established, that while a common carrier cannot be compelled to do so, it may contract to carry the goods to a point beyond the terminus of its own lines, and thus assume all of the obligations of the whole route so as to become liable for the delivery at such point, and the liability thus attached at the commencement will continue throughout the entire transit. Where it so undertakes to transport the goods throughout to destination, all connecting carriers employed in furthering and completing such transportation become agents of the initial or contracting car-

rier, for whose defaults the initial or connecting carrier is responsible to the owner of the goods. Ingwerson v. Railroad, 116 Mo. App. 139; Bank v. Some, 119 Mo. App. 1; Hardin v. Railroad, 120 Mo. App. 203; Buffington v. Railroad, 118 Mo. App. 476; Davis v. Railroad, 126 Mo. 69; Eckles v. Railroad, 112 Mo. App. 240; Eckles v. Railroad, 72 Mo. App. 296; Lesinsky v. Great Western Dispatch, 10 Mo. App. 134; Clothing Co. v. Merchants' Dispatch, 106 Mo. App. 487; Hendrix v. Railroad, 107 Mo. App. 127; Hutchinson on Carriers (3 Ed.), 226-230. The shipping contracts involved in counts 1 and 2 have been construed by this court and held to be contracts for a through shipment. Ingwerson v. Railroad, 116 Mo. App. 139; Bank v. Railroad, 119 Mo. App. 1. The contracts relating to the live stock mentioned in the 3rd and 4th counts are contracts for a through shipment. Colfax v. Railroad, 118 Cal. 648; 40 L. R. A. 78; Eckles v. Railroad, 112 Mo. App. 240; Buffington v. Railroad, 118 Mo. App. 476; Bushnell v. Railroad, 118 Mo. App. 623; Railiff Bros. v. Railroad, 118 Mo. App. 644; Hardin v. Railroad, 120 Mo. App. 203; Davis v. Railroad, 122 Mo. App. 637; Hutchinson on Carriers (3 Ed.), sec. 238.

GOODE, J.—The petition was filed to the September term, 1905, of the circuit court of Audrain county, and, the brief for plaintiffs says, after the amendment of section 5222 of the Revised Statutes of 1899 took effect. Said statute makes a carrier receiving property to be carried to a point either within or without the state, or a railroad or transportation company issuing receipts or bills of lading in this State for property, liable for loss, damage or injury to the property, caused by the negligence of the receiving carrier or the railroad or transportation company issuing the bill of lading, and also for damage due to the negligence of any other common carrier, railroad or

transportation company to which the property is delivered and over whose line it passes. The amendment enacted in 1905, permitted a plaintiff suing for loss or damage to property while in transit, to unite as defendants all carriers through whose hands the property passed, and to recover in such case from the culpable defendant. Laws 1905, 54. This action is against the St. Louis & Hannibal Railway Company, the initial carrier of the property in question, and the Wabash Railroad Company, a connecting carrier. It was brought to recover the losses on four shipments of hogs, transported over the lines of the defendants, on September 11, 1903, September 20, 1904, October 11, 1904, and March 1, 1905. The petition is in four counts, declaring respectively on the separate shipments, and asking damages for losses sustained by plaintiff in consequence of delay in the transportation of each, which caused the hogs not to reach the market when they were expected to be sold and forced a sale at a lower market; also for death or injury by negligent handling during transit of twenty-nine hogs. The gravamen of each count of the petition as regards not only the delay, but the death and injury, is negligence, and the common law liability of defendants as insurers of the safe delivery of the property, is not involved. Bills of lading for the shipments were issued by the agent of the St. Louis & Hannibal Company at Perry, Missouri, where the hogs were received. The bills for the shipments on September 11, 1903, and September 20, 1904, were in the same form and purported to be between Crockett and Davidson, as owners, and the St. Louis & Hannibal Railway Company, and said parties agreed the railroad company should transport the hogs for the parties of the first part from Perry Station to the National Stock Yards, Illinois, consigning them to Zeb Steele Commission Company at the National Stock Yards, for a through rate per hundredweight, which was less than

the regular tariff rate applying to shipments not covered by the conditions and stipulations contained in the bills of lading. Besides immaterial statements, those bills recited the parties had agreed as follows:

"If the destination of the aforesaid stock be located on the line of the St. Louis & Hannibal Railway, then the St. Louis & Hannibal Railway Company agrees to deliver same at destination, after payment of proper charges by said consignee; but if the ultimate destination of said stock be located beyond the line of St. Louis & Hannibal Railway, the St. Louis & Hannibal Railway Company hereby agrees to deliver same to the next connecting carrier; and it is understood and hereby agreed that the St. Louis & Hannibal Railway Company shall be held liable under this contract only for loss or damage occurring on its own line, and while the said stock is in its actual custody, and that the duty and liability of said company shall absolutely cease and terminate upon delivery of the aforesaid stock to its next connecting line; and, when the stock is destined to any point beyond the line of its railway, said first party guarantees to protect the through rate from point of origin to ultimate destination in consideration of the covenants and agreements herein set forth."

It was in proof the partnership between Crockett & Davidson had been settled, and the former had succeeded to the right of the firm to maintain this action. The bills of lading issued for the shipments of October 11, 1904, and March 1, 1905, were alike and constituted contracts between the St. Louis & Hannibal Railway Company and J. P. Crockett, the plaintiff, by which said company engaged to transport the carloads of hogs from Perry, Missouri, to the end of the company's railway at Gilmore, Missouri, for a special rate less than the regular tariff rate applying to shipments not covered by the conditions and stipulations con-

tained in the bills. Among other stipulations were these:

"And the said party of the first part further agrees to transport said live stock to Gilmore, Mo., station within a reasonable time, and there deliver the same to the Wabash Railroad Company for further transportation, same being consigned to Steele, Long & Pollock, at National Stock Yards, Ill.; and whereas the ultimate destination of said live stock is located beyond the terminus of the line of the St. Louis & Hannibal Railway Company, it is further understood and agreed by and between the parties to this contract that the St. Louis & Hannibal Railway Company shall only be bound and required to transport said live stock within a reasonable time to the terminus of its line, and there deliver the same to the Wabash Railroad Company for the completion of such shipment; and it is expressly understood and agreed by and between the parties hereto in the continuation of such shipment of said live stock from Gilmore, Mo., station to its ultimate destination, the said Wabash Railroad Company is and shall be held to be the agent of the party of the second part, and not the agent of the party of the first part; and it is further understood and agreed by and between the parties to this contract that the St. Louis & Hannibal Railway Company shall be held liable under this contract only for loss or damage occurring on its own line and while the said live stock is in its actual custody, and that the duty and liability of said St. Louis & Hannibal Railway Company shall absolutely cease and terminate upon the delivery of the aforesaid stock to the Wabash Railroad Company at Gilmore, Mo., station."

Evidence was introduced by plaintiff tending to prove losses were sustained on all the shipments in consequence of unreasonable delays in transit, which prevented the stock from reaching the markets they were intended for and forced sales on lower markets;

also that negligent handling of the hogs which made
up three of the shipments caused the death of some and
injury of others; but there was no evidence of which
company had the freight in custody when the delays
and negligent handling occurred.  The theory of re-
covery relied on is that both companies contracted
with plaintiff to transport the hogs to destination;
that agreements by both parties resulted either from
the two being partners in the traffic business between
those points, or else from the import of the contracts
entered into between plaintiff and the initial carrier,
the St. Louis & Hannibal Company, and the traffic ar-
rangement in force between said company and the Wa-
bash Company.  Each count of the petition contains a
paragraph like this one:

"Plaintiff further states that the defendants, at
all times mentioned herein, were partners in the busi-
ness of transporting stock from Perry, Missouri, to
National Stock Yards, Illinois, and that each jointly
used the railroad of the other for the purpose of trans-
porting property, and that as to all shippers the line
between Perry and National Stock Yards was a con-
tinuous line used, owned and operated jointly by said
defendants."

Each count also alleges the hogs were delivered
to defendants (using the plural number) and defend-
ants, in consideration of the freight charges, agreed
well and safely to carry them from Perry to the Na-
tional Stock Yards, Illinois, and there deliver them
to the consignee, with further averments that plaintiff
suffered losses because of the carelessness of defend-
ants.  Aside from the bills of lading, the only evidence
relied on to prove a partnership between the two com-
panies or a joint agreement by them to carry the stock
over the entire route is the deposition of Richard E.
Berger, Freight Accountant of the Wabash Company.
That witness testified some of the cars containing the
several shipments in controversy were thirty-four feet

long and for hauling those the rate from Perry to the National Stock Yards was $19; the other cars were thirty-six feet long and the rate for them was $19.75; and to those rates was added $4 for hauling by the Merchants' Bridge Company over the Mississippi river at the terminus of the Wabash Company. He testified further as follows:

"There is no freight collected at Gilmore, and no freight collected on the west side of the Mississippi river. No freight is collected until the property is delivered at National Stock Yards, in East St. Louis. We render a bill to the Stock Yards or consignee for the entire freight, including the bridge toll. The bridge toll shows separately on these waybills. The expense bills are the property of the consignee and are rendered by the agent and do not come under my supervision. I receive reports from the agent at National Stock Yards and he reports that he collects; there would be no separation of any charges on that report. A car shipped from Perry, Missouri, to National Stock Yards that cost $23, on that car there would simply be a charge of $23 made. The Wabash would collect that entire $23; it would go into the general fund of the Wabash Railroad Company.

"We have an arrangement with the Bridge Company by which we pay them $4 per car for running over their tracks or having cars hauled over their tracks, and a further arrangement with the St. Louis & Hannibal by which we retain 35 per cent of the total freight on shipments from Perry. The Wabash keeps a set of books of account with the Bridge Company and the St. Louis & Hannibal R. R. Co., pursuant to that arrangement. At the end of each month they divide in accordance with that arrangement, the Wabash sending to the St. Louis & Hannibal its part, and sending to the Bridge Company its part, and retaining the rest. That has been in force since 1903 down to the present time.

"It is part of that arrangement, as I understand, that the Wabash carries the freight from Gilmore to its eastern terminus. The Bridge Company then carries it from the eastern terminus of the Wabash Company to the National Stock Yards, and for the entire service a lump sum is charged to the shipper. The arrangement giving 35 per cent to the Wabash and 65 per cent to the St. Louis & Hannibal is issued by the tariff department of this road and the St. Louis & Hannibal Railroad, but in just what form I could not say; it is customary to print division sheets showing what such arrangements are.

"This division of 35 per cent and 65 per cent between the Wabash and the St. Louis & Hannibal is based upon an agreement between the two roads as to the division of the income. It is a joint traffic agreement, more particularly speaking, a joint agreement between the traffic departments. The St. Louis & Hannibal has authority under that agreement to bill through to the National Stock Yards.

"Each of these bills shows on the face that the shipment is over both roads. The waybills all show information indicating that the cars were to be forwarded over the Merchants' bridge.

"Q. And under the traffic arrangement or agreement referred to the St. Louis & Hannibal, as the initial carrier, has authority from the bridge company and from the Wabash Railroad Company to bill through to the National Stock Yards and then the settlement is made in accordance with the standing agreement? A. I do not think the bridge company is consulted in a matter of this sort. My impression is that the arrangement is made between the Wabash and the St. Louis & Hannibal traffic departments and they determine among themselves what bridge or what ferry company it would be sent over. There is an arrangement between the Wabash Railroad Company and the bridge or ferry company, by which the Wabash has the right

on payment of certain compensation to send its freight over the bridge or ferry. I don't know anything about the rates being approved by the Interstate Commerce Commission.''

This deposition was excluded from the evidence against the St. Louis & Hannibal Company, because the court found said company had not been notified legally it would be taken, but it was admitted against the Wabash Company. After refusing requests for directions to the jury preferred by each one of the defendants to find verdicts on each count in its favor, the court, at plaintiff's request, gave this general instruction applicable to all the counts:

''If you believe from the evidence that at all times mentioned in the petition the Wabash Railroad Company and the St. Louis & Hannibal Railroad Company were common carriers, and each had its own line of road, and if you further believe that the said railroad companies agreed to associate themselves together and formed what is to the plaintiff as a shipper of live stock, a continuous line between Perry and National Stock Yards, and if you further believe that a contract was made by the plaintiff as a shipper with the St. Louis & Hannibal Railroad Company at Perry, to carry plaintiff's stock through to the National Stock Yards over its own and the Wabash lines at an agreed sum for the whole trip, and if you believe further such agreed sum was collected by the Wabash and divided between the two roads, then as to the plaintiff as a shipper from Perry to the National Stock Yards the said roads are jointly liable for negligence causing loss on any part of the whole line between Perry and National Stock Yards.''

Other instructions given at plaintiff's instance dealt with the separate shipments and the counts of the petition declaring for the separate losses sustained in each, required the jury to find as the conditions of a verdict for plaintiff, on either count, that the ship-

ments were delivered to defendants (plural) at Perry to be transported by them to the National Stock Yards for the usual freight charge; that defendants received the hogs at Perry under such agreements and undertook to ship them with the usual speed to East St. Louis, and that on account of the negligence of defendants' employees, the hogs were kept longer than the usual time and were handled negligently while on the road; reasonable and ordinary care for their safety while in transit was not exercised, and in consequence some of them were killed and others crippled. The St. Louis & Hannibal Company prayed the court to instruct unless the jury found said company was negligent in handling the live stock mentioned in the different counts, the verdict should be in its favor; and besides immaterial requests, the Wabash Company asked the court to instruct there was no evidence in the case to prove the St. Louis & Hannibal and the Wabash Company were partners in the transportation of plaintiff's stock, and no evidence of negligence on the part of the Wabash Company. Those requests were refused and exceptions saved. The jury assessed damages in plaintiff's favor on each of the counts of the petition, and judgment having been entered accordingly, defendants prosecuted this appeal.

The averments in the four counts of the petition of a co-partnership of the railway companies might be considered as superfluous and the action treated as one seeking recovery alone on the statute, which holds the initial carrier responsible to the shipper for damage imputable to the negligence of any carrier participating in the transportation, unless the first one absolves itself from liability beyond its own route by agreeing to transport no further than its terminus, as the construction put on the statute by the appellate tribunals of the state allows to be done. [R. S. 1899, sec. 5222; McCann v. Eddy, 113 Mo. 59, 33 S. W. 71; Marshall v. Railroad, 176 Mo. 480, 75 S. W.

638; Western Sash & Door Co. v. Railroad, 177 Mo. 641, 76 S. W. 998.] In a case for negligent damage like this is, the statute permits two or more carriers engaged in the transportation of freight, to be united as defendants; a partnership among the different carriers, or a joint undertaking by them to carry the particular freight not being essential to recovery. As regards relief on the statute in the present case, these observations are to be made: If it had been brought against the St. Louis & Hannibal Company alone, as the initial carrier, recovery would have been possible on the first and second counts, but not on the third and fourth. This is true because in the main contracting clause of the bills of lading issued for the shipments declared on in the first two counts, the St. Louis & Hannibal Company agreed to transport the freight from Perry station where it was received, to destination at the National Stock Yards, Illinois, and the subsequent clauses which declared it agreed to carry only to the end of its line and there deliver to a connecting carrier, would not prevent the contracts from being undertakings by said company for through carriage, or confine its liability for negligent losses to those occurring on its own line; whereas in the main contracting clause of the bills of lading issued for the shipments, which are the subject-matter of the third and fourth counts, the St. Louis & Hannibal Company agreed to carry the property no further than Gilmore, the terminus of its line, and, therefore, its liability for negligent losses was confined to such as occurred on its own line. Cases supra. But as plaintiff chose to proceed against both railway companies in a single action, it became a condition of recovery against either, that he should adduce evidence tending to prove its negligence caused the loss, as we ruled, giving reasons for so ruling, in Blackmer & Post Pipe Co. v. Railroad, 137 Mo. App. 479, 119 S. W. 1, 13. No evidence having been put in to show which defendant was in fault, it

follows plaintiff failed to make out a case on the statute.

The petition really counts on a partnership between the two defendants as a ground of recovery, but the instructions authorized a verdict against defendants without exacting a finding that they were partners, if the jury found certain facts which the court said would make the defendants jointly liable for damage due to negligence anywhere en route. The facts hypothesized as conditions of joint liability were these: First, at the times mentioned in the petition the two companies were common carriers, each having its own line of road; second, they had agreed to associate themselves together and had formed what was to plaintiff, as a shipper of live stock, a continuous line between Perry and the National Stock Yards; third, contracts were made by plaintiff with the St. Louis & Hannibal Company at Perry for the carriage of plaintiff's stock over its own and the Wabash line for an agreed sum for the whole trip; and, fourth, the Wabash Company had collected said sum and divided it between the two roads. The evidence showed conclusively the existence of those facts, except the agreement signified by the words "agreed to associate themselves together" and except the undertaking by the St. Louis & Hannibal Company to carry plaintiff's stock through to the National Stock Yards. Both parties were common carriers each with its own road; the two formed what was to plaintiff and was in fact, so far as the rights of these parties are concerned, a continuous line between Perry and the National Stock Yards; the entire haul was made from Perry to said yards for an agreed sum, which was collected by the Wabash Company and divided between the two roads, after paying $4 to the Merchants' Bridge Company. It is true that from Luther on the west bank of the Mississippi river, to the National Stock Yards, the cars passed over the bridge company's line; but this is im-

material, because the Merchants' Bridge Company's relation to the shipments was that of agent either for both the companies, or for the Wabash; and though it was answerable to plaintiff for its own torts, the other companies were answerable for them, too; or the Wabash was in any event, the evidence being vague about the relation of the St. Louis & Hannibal Company to the Merchants' Bridge Company.

The words "agreed to associate themselves together" were misleading, being too vague to prescribe a test of either a partnership, or if there were no partnership, of a joint agreement by defendants to carry plaintiff's stock over the entire route. The jury were not advised for what purpose and to what extent the companies must have agreed to associate in order to make them partners, or otherwise dual contractors with plaintiff. Not every arrangement or association between carriers whose lines connect will render them partners nor make a contract of carriage entered into by one of them with a shipper the contract of both. An agreement by connecting railways to charge through rates of freight from stations on the line of one to stations on the line of the other, for the transportation of each other's cars over their respective lines, does not make the two companies partners nor necessarily bind both by contracts one of them makes. Such traffic arrangements are in force generally among railway companies, which are accustomed to receive each other's cars at junction points and fix through freight rates between various stations. The following language, or its equivalent, is found in some cases: "If several common carriers having each its own line, associate and form what to the shipper is a continuous line, and contract to carry goods through for an agreed price, which the shipper or consignee pays in one sum and which the carriers divide among them, then as to third parties with whom they contract, they are liable for a loss taking place on any part of the whole line."

[Wyman v. Railroad, 4 Mo. App. 35, 39; Shewalter v. Railroad, 84 Mo. App. 584, 587; White, etc., Co. v. Railroad, 87 Mo. App. 330, 334.] The doctrine of that excerpt, if force be allowed to all the expressions used, is sound; for it exacts not only an association among the several carriers and a continuous route composed of their separate routes, but that they, and not merely one of them, shall have contracted with a shipper to carry goods through for an agreed price. In other words, the obligation of the several companies to the shipper rests upon the contract made with him as well as upon the other facts stated. Of course, if two or more carriers have formed a co-partnership for the transportation of freight over their respective lines, then the contract made by one of them with the shipper will be the contract of all; at least in the absence of a stipulation to the contrary. And if several carriers are not a co-partnership, one of them may be empowered to enter into through contracts with the shippers in behalf of all and each will be responsible for the defaults of all. In any action by a shipper against different carriers which have handled his property between the starting point and destination, when the question is, which is responsible for a loss or injury to the property while in transit, the terms of the bill of lading, which is the contract for carriage, must be scrutinized. The main instruction in this action made both companies liable for losses due to the fault of either, if the jury found certain undisputed facts and further found the two companies had agreed to associate themselves together and form what was to plaintiff a continuous line. But the bills of lading expressly exempted the St. Louis & Hannibal Company from responsibility after it had turned the freight over to the connecting carrier, namely, the Wabash Company, without, however, expressly exempting the latter company from responsibility for losses occurring in transit but not while the stock was in its charge. But

apart from the statute on which, as we have shown, the verdict cannot stand, the Wabash Company was not responsible for the negligence of the St. Louis & Hannibal Company unless the former company agreed, either by force of a partnership between it and the other company, or otherwise, to carry the stock over the whole route. Whether it agreed otherwise than constructively as a partner with the St. Louis & Hannibal Company, which signed the contracts for carriage, must be ascertained from the terms of said contracts, to-wit, the bills of lading, whose relevant parts we have quoted, and from the acceptance of the freight by the Wabash at the junction point, and the testimony of the witness Berger, there being no other evidence relevant to the inquiry. Two of the bills of lading said the St. Louis & Hannibal Company agreed to transport the property to destination over its own line and the lines of connecting carriers, and in the other two, said it agreed to transport to Gilmore, the terminus of its line, and there deliver the property to the Wabash Company to complete the carriage. The only agreement on the part of the Wabash to be deduced from its receipt at Gilmore of the stock shipped under those instruments, is an agreement to haul the property from the junction to destination; and by this agreement its responsibility for losses would be limited to those happening after it accepted the property. [Halliday v. Railroad, 74 Mo. 159.] In the cited case the Supreme Court said if a carrier undertook to transport beyond the end of its line, it would be responsible according to the terms of the contract of shipment, if it contained no exemption from loss or injury occurring on the connecting lines as well as its own, *and a connecting carrier would be responsible to the shipper for its own fault or negligence according to the terms of the shipper's contract with the contracting carrier.* In McLendon v. Railroad, 119 Mo. App. 128, 95 S. W. 943, it appeared the freight had been delivered to the

West Shore Railroad Company at New York for transportation to Kansas City, Missouri, under a contract made with said company, which agreed to carry only to the end of its line and declined to be liable for damage occurring elsewhere. The plaintiff recovered against both defendants in the court below in an action not based on the statute cited supra, and the judgment was reversed in the court of appeals because the contract of shipment destroyed the theory of plaintiff's case, which was that the two lines had "formed themselves into a single and through line of transportation, and in that capacity the West Shore Company received the freight and the Wabash Company completed the carriage and delivered it to the plaintiff." The court further said the two companies and the plaintiff had the right to contract as they pleased when uncontrolled by statute or public policy, no matter what arrangement may have existed between the companies themselves. That decision was given on a contract of shipment like those before us and is in point against the proposition that such a contract imposes a joint and several liability on each carrier for the whole route; which is the same as to say the contract of shipment is not a joint undertaking by both carriers for the entire distance, for then both would be responsible for what happened anywhere in the transit. It is true the witness Berger testified the St. Louis & Hannibal Company had authority under the agreement between the two companies, "to bill through to the National Stock Yards." This is far from saying it had authority to issue bills of lading binding the Wabash as a carrier over the whole route; and, moreover, if it had such authority, it was not exercised in the contracts with plaintiff.

The only theory of dual liability left is that of co-partnership between the two defendants which made the contracts entered into by the plaintiff with the St.

147 App—24

Louis & Hannibal Company, obligations of both companies. The circumstances mentioned in the main instruction for plaintiff were not submitted to the jury as proof, if found to have existed, of a partnership, but of joint contracts between defendants and plaintiff, and the theory of partnership is not much insisted on by plaintiff's counsel. In themselves these facts would not constitute a partnership between the defendants, because they lack the chief elements of partnership, such as a division of profits and expenses, or a right in each company to manage the entire business transacted by both between the points of shipment and destination, or community of property interests. [Campbell v. Dent, 54 Mo. 325; Musser v. Brink, 68 Mo. 242; Ashby v. Shaw, 82 Mo. 76.] Neither would those circumstances warrant plaintiff, as a reasonable man, to deal with the two companies as partners, in view of the bills of lading accepted by him, which, instead of holding them out as partners, excluded the notion of joint liability. When we look beyond the instructions to the evidence, we find nothing which tended to establish a partnership or to induce plaintiff or the public to believe in one. The existence of a joint traffic agreement between the traffic departments of the two companies, and authority in the St. Louis & Hannibal Company to issue through bills of lading from Perry to the National Stock Yards, with no stipulation for a division of profits and losses, but simply one for a prorating of the freight charges, does not constitute a partnership according to the great weight of decision. [Insurance Co. v. Railroad, 104 U. S. 146; Penn., etc., R. R. v. Jones, 155 U. S. 333; Insurance Co. v. Kuntz Line, 4 Woods (U. S. C. C.) 268; Deming v. Railroad, 21 Fed. 25; Gas v. Id., 99 Mass. 220; Burrows v. Is., 100 Mass 26; Aigin v. Id., 132 Mass. 423; Converse v. Transp. Co., 33 Conn. 166; Wayman v. Railroad, 58 Minn. 22; Watkins v. Id., 8 Mo. App. 569; Railroad v. Waters, 50 Neb. 592; Mont-

gomery, etc., R. R. v. Moore, 51 Ala. 394; Note to Wells
v. Thomas, 72 Am. Dec. 238; Irvin v. Railroad, 92 Ill.
103; Hot Springs R. R. v. Trippe, 42 Ark. 465; Knott
v. Railroad, 98 N. C. 73, 2 Am. St. Rep. 321; Ft.
Worth, etc., R. R. v. Johnson, 5 Tex. Civ. App. 24, 23
S. W. 827.] A few cases look opposed to this doctrine,
but in most, or all of them, the agreement between the
carriers will be found, on critical examination, to con-
tain either the essential elements of partnership, such
as a pooling of the earnings and division of expenses
and profits, or else there will be found some distinct
ground of liability on the part of the carrier sued,
arising from the nature of the bill of lading and show-
ing it was the joint obligation for the entire route of
the several carriers which handled the shipment.
Where two or more companies had formed an associa-
tion for the transportation of persons or property
under a name which was not that of either of the com-
panies, and in the name of the association had con-
tracted with a shipper to carry his freight from the
point of reception to destination, they were treated as
partners. [Block v. Railroad, 139 Mass. 308; Rice v.
Railroad, 3 Mo. App. 27.] In the cases next cited, a
partnership was found to exist in the arrangements
entered into by two or more carriers for through trans-
portation over connecting routes, because a division of
profits, not merely a pro-rating of gross receipts, was
required, as well as other elements of partnership.
[Champion v. Bostwick, 18 Wend. 675, 31 Am. Dec.
376; Barrett v. Railroad, 9 Mo. App. 226.] And in the
following cases the courts held the defendant liable
on the special terms of the bills of lading. [Hart v.
Railroad, 8 N. Y. 37; Bradford v. Railroad, 7 Rich. L.
(S. C.) 201, 62 Am. Dec. 411.] See, too, on these ques-
tions, 4 Elliott, Railways, secs. 1446, et seq.; 1 Hutchin-
son, Carriers (M. & D. Ed.), secs. 249, 264, incl. In
the case at bar we have examined the contracts of ship-
ment and find there is nothing in them to indicate

either a partnership or otherwise a joint undertaking on the part of the two defendants. It follows from what has been said no liability was shown on the part of the Wabash Company in consequence of its having contracted with plaintiff for the entire route, either as partner of the St. Louis & Hannibal or according to the meaning of the bills of lading. We may say further there was no evidence tending to establish a partnership as against the St. Louis & Hannibal Company because the deposition offered for the purpose was held inadmissible as to said defendant.

As to the liability, independent of the statute, of the St. Louis & Hannibal Company for losses on the two shipments for which it issued through bills of lading, it is enough to say the petition does not seek recovery on that ground, as the joinder of the Wabash Company shows. Without the statute the first company would be prima facie answerable for those shipments; but might exonerate itself by proving delivery of the stock in a reasonable time, and in good order to the next carrier (Snider v. Express Co., 63 Mo. 376), a defense against negligent losses which the statute does not tolerate from an initial carrier if it receives freight for through shipment over other lines than his own.

The judgment is reversed and the cause remanded. All concur.

## ON MOTION FOR REHEARING.

GOODE, J.—A motion for rehearing has been filed in this case supported by an elaborate brief, contending the rules of law declared in the opinion are contrary to the decided cases and of disastrous tendency. The propositions of law the opinion is said to contravene will be stated in their order. First, it is contended there is a presumption the last of several carriers which hauls a consignment of freight—in this

case the Wabash Company—is to blame for damage occurring in transit, and as enforcing this presumption we are cited to Crouch v. Railroad, 42 Mo. App. 252; Jones v. Railroad, 115 Mo. App. 235, 91 S. W. 158; Hurst v. Railroad, 117 Mo. App. 38, 94 S. W. 794; Connelly v. Railroad, 133 Mo. App. 310, 133 S. W. 233. Said presumption does not apply to a case like the present, where the negligence of the carrier is charged to have caused the damage. We so ruled in Hurst v. Railroad, supra, and the other cases cited were based on the failure to perform contracts to deliver the freight at destination and not on tortious management. That a plaintiff who avers loss or damage to his property while in shipment was caused by negligence, must prove the averment, has been decided repeatedly in this State and the decisions are reviewed in Stanard Mill Co. v. Transit Co., 122 Mo. 258, 275, 26 S. W. 704.

The second proposition adduced in the brief on motion for rehearing is that the presumption against the final carrier obtains in an action on section 5222 of the statutes (1899) as amended in 1905, and we are charged with erroneously holding the amendment did away with the presumption. Our answer is the presumption never applied to actions on the statute when negligence was charged in the petition, as possibly it must always be; since the redress allowed by the statute is confined to losses caused by the negligence of a carrier.

The third contention is we erred in holding the bills of lading for shipments declared on in the third and fourth counts of the petition were not contracts for through shipment. Those bills of lading were so drawn as to bring them within express decisions of the Supreme Court of Missouri, as interpreted by the Supreme Court of the United States, as to what constitutes a contract by the initial carrier simply to transport to the end of its own line. [Railroad v. Mc-

Cann, 174 U. S. 580; Western Sash & Door Co. v. Railroad, 177 Mo. 641, 76 S. W. 998.] In Blackmer, etc., Co. v. Railroad, 137 Mo. App. 479, 504, 119 S. W. 13, we intimated doubt about the soundness of this construction of section 5222, which the writer thinks was enacted to hold the initial carrier answerable if the goods were received for carriage to a point beyond its own line, no matter in what form the bill of lading was issued. The construction began with Dimmitt v. Railroad, 103 Mo. 433, 15 S. W. 761, was retained in a modified form in McCann v. Eddy, 133 Mo. 59, 33 S. W. 71, and, right or wrong, is beyond the power of this court to alter.

Fourthly, it is contended in the motion for rehearing that where goods are hauled from the point of shipment to destination by several carriers and losses occur in transit, the shipper may recover from the initial carrier in an action in which all are joined as defendants, without introducing evidence to prove the loss was due to the negligence of the first carrier; that the amendment to the statute did not impose on the shipper the burden of proving the loss was due to the first carrier's negligence in order to hold it responsible. In support of this proposition we are pointed to section 2870, R. S. 1899, which allows contribution among judgment defendants in an action for tort, to the same extent as such defendants in an action founded on contract may have contribution. It is said if the first carrier is held responsible to the shipper without proof the loss was due to his negligence, section 2870 affords a remedy over against the carrier which was to blame; therefore it is argued the court reasoned unsoundly in Blackmer, etc., v. Railroad, that if the first carrier is held answerable in an action wherein it is joined with others, without proof the loss was due to its fault, it would be deprived of a remedy against the carrier in fault. What application section 2870 has to the point we fail to perceive. Said

section only allows contribution among defendants in a tort case who have been held liable as joint tort-feasors. The redress contemplated in section 5222, before it was amended, was that if the initial carrier was held liable, when innocent, and hence not a joint-tortfeasor, it could recover against the carrier who was in fault. The one statute contemplates contribution among two or more wrongdoers, and the other contemplates indemnity to an innocent carrier which has been held responsible for a loss. As said in the Blackmer-Post Pipe Company case, the amendment was, perhaps, so framed as to frustrate, in some measure, the policy of the statute, but we still think its language is such as to preclude any other interpretation than the one given to it in said case. It should be borne in mind the shipper may still confine his action to the initial carrier and get all the redress the statute afforded prior to the amendment; but if he chooses to unite several carriers in the action, he must do so *cum onere;* that is, take on himself the burden of proof imposed by the amendment.

The motion for rehearing is overruled. All concur.