CHARLES H. GASS & another *vs.* NEW YORK, PROVIDENCE & BOSTON RAILROAD COMPANY.

CHARLES H. NORTH *vs.* SAME.

Three common carriers ran lines of steamboat or railroad transportation, each covering a part only of a certain route, which formed together a continuous line of through transportation of goods over that route. A rate of freight fixed by mutual agreement was charged for the through service, collected by the carrier whose line included the end of the route, and divided between the three in an agreed proportion. *Held,* that no partnership or joint liability to shippers of goods was created by these facts.

A steamboat connected with a railroad at a wharf owned by the proprietors of the latter; and the railroad connected elsewhere with another railroad, the three forming a continuous line of through transportation of goods. Upon the arrival of the steamboat at the wharf, with goods for through transportation, a list of them, made up from the freight book of the boat, was delivered by the clerk of the boat to the agent of the first railroad, to be forwarded by an early train to the agent of the second railroad at the end of the line, for the purpose of making out and having ready there the consignees' bills of the goods upon their arrival by a later train, which soon afterwards was run down upon the wharf on a track near to the berth of the boat. The employees of the boat and those of the railroad, in equal numbers, then acted in concert in transferring goods from the boat to the cars, partly by hand and partly on trucks some of which belonged to the boat and some to the railroad; all of them sharing both in the removal of goods from the boat to the wharf, and their further removal across the wharf into the cars; and no account was kept by any one of goods delivered by the boat or received by the railroad. While they were thus engaged, and before all of the goods had reached the wharf, a fire broke out which stopped the work and destroyed the boat, wharf, cars and all the goods. *Held,* that the railroad was not liable to the shippers for any of the goods destroyed upon the boat.

TWO ACTIONS OF CONTRACT, for the value, in the first case, of one hundred and fifty-six tubs of butter, and in the second case of twenty-five tierces and two hundred cans of lard, alleged to have been delivered by the plaintiffs respectively to the defendants as common carriers, for transportation over a route between New York and Boston, of which the defendants' railroad formed a part. At the trial, before *Foster*, J., these facts appeared:

The defendants' railroad, which extends from Groton in Con-

necticut to Providence in Rhode Island, connected at Groton with steamboats of the Merchants' Navigation and Transportation Company, which ply between Groton and New York, and at Providence with the railroad of the Boston and Providence Railroad Company, which extends from Providence to Boston. The three lines formed together a continuous line of transportation of passengers and goods between New York and Boston, called the Stonington Line. By an arrangement between the three corporations, fixed rates were charged for the through transportation of goods and passengers; the entire freight on goods transported from New York to Boston was collected at the end of the route in Boston, by the Boston and Providence Railroad Company; and an account was kept thereof, and the receipts were divided in a fixed proportion between the several corporations.

At the end of their road in Groton, the defendants owned a wharf, on which were their stations for passengers and freight, and to which the steamboats of the Merchants' Navigation and Transportation Company came from New York. Upon one of these steamboats, named the Commonwealth, the plaintiffs, on December 28, 1865, caused the goods described in the declaration to be shipped for Boston, without any bill of lading or special contract of any kind. The boat arrived at the wharf at Groton about twenty minutes before midnight. The passengers and their luggage were immediately transferred to a train of cars which left for Boston shortly after midnight; the crew and deck hands of the boat then were served with a meal, as usual; and while they were engaged at the meal, the defendants' employees prepared a train of freight cars and moved it down upon a railroad track not more than seventy feet distant from the boat, and from which sheds extended down to both of the boat's gangways.

On the passage of the steamboat from New York to Groton a list of the Boston freight was made up, as usual, from the freight book of the boat, to be forwarded to Boston by the passenger train, so as to enable the clerks of the Boston and Providence Railroad Company at Boston to make out and have ready for the consignees of the goods at Boston bills thereof upon the

arrival there of the freight train, which usually started from Groton about four o'clock in the morning, or four hours after the departure of the passenger train. This list, on which the plaintiffs' goods, together with numerous others shipped in like manner on the boat, were entered and described, was delivered, on the night in question, by the clerk of the steamboat to the defendants' agent in his office at the station, about five minutes after the boat reached the wharf; and was unsigned, entitled "Steamer Commonwealth for freight from New York for Boston December 28, 1865," and made up in six columns, headed respectively Merchandise, Destination, Consignees, Weight or Measure, Amount Freight, Expenses Paid. The articles of each shipment of the plaintiffs bore the initials or other marks of the plaintiffs respectively, and were so designated on the list.

After the hands on the boat had finished their meal, which occupied from ten to fifteen minutes, the discharge of goods from the boat and the loading of the freight train was begun. It was agreed or was proved at the trial "that the steamboat company kept and employed no men at the terminus or depot at Groton, who had anything to do with the unloading or loading of goods; that the defendants employed and kept there for this and other service from twenty to thirty men, who were engaged in different positions; and the boat had on board, who came in her from New York, eighteen men of the crew and deck hands, who loaded freight in New York, who were engaged in the same service with the defendants' men at Groton; that the boatmen did not discharge and remove the goods from the boat on to the wharf, and deliver at any particular place or point, and the defendants there take them and load them into the cars; but the arrangements, course of proceeding and practice between the parties, and which they pursued that night, were as follows:

" The defendants had in the depot some twenty trucks or upwards, and their said men went on and into the boat with their trucks, and took goods at the place where they were and had been originally stowed, and carried the goods either by hand, or rolled them on trucks, from that place off the boat, and into the

cars where they were placed to make up the freight train. The boatmen took trucks and engaged in like service. The goods were usually taken from one of the guards on one side of the boat by the railroad men, and by the boatmen from the other side. If the defendants had the most men, some of them were placed with the boatmen. When the guards were cleared, the men went together to the other parts of the boat. One of the mates was on board attending to the discharging. There were three boatmen on each side of the boat acting as stevedores, under the direction of the mate, as testified by him, who broke out the freight when it was such as required it, and put it on the trucks; but when the freight was large, or it became necessary, both classes of men joined together in loading the trucks. There was sometimes one man, and sometimes there were two men to a truck. The boatmen and the railroad men all acted together. The boat had some trucks; and both classes of men went together on board the boat, and took the freight from the point where it was then and had been originally placed; and both ran the trucks or carried the goods by hand off the boat and into the cars of the defendants. Whenever any extra men were required for this service, the arrangement was for the parties to share the expenses equally, so that at all times each party provided and paid an equal number of men for loading and unloading. The clerk with the freight book was not present and had nothing to do with discharging. One of the mates acted in thus delivering or discharging the freight. No account was kept by any one of what was delivered or received, and no goods were checked off on the freight book as they were delivered at any time, and no receipt required or given. This was never done."

Between half past one o'clock and two o'clock on the morning of December 29, while the transfer o. freight from the boat to the cars was thus going on, a fire broke out in the bunk-room of the defendants' station; and spread so rapidly as to drive away suddenly all the men engaged in the work; and consumed he steamboat, wharf, station-houses, sheds and cars, and all' the freight, including the goods of the plaintiffs. There was no evi-

dence tending to show that this fire was the result of negligence or design on the part of any one connected either with the steamboat or the railroad.

Charles A. Davis and Henry Davis, two witnesses called by the defendants, testified that they were in the employment of the defendants, and "had charge of receiving the freight as it came from the boat; that they received it on the dock, and had no charge of it until it reached the dock." Charles testified further that he was the defendants' yard master and despatcher of trains, and that it was his duty to see to the proper storage of freight in the cars; that although the railroad men were sent into the boat to get goods, he had no charge of them there, but while in the boat they were under the charge of the mate, although they were all the time in the employment of the defendants and paid by the defendants for all their services rendered on the boat as well as elsewhere; that as to all the men engaged in the work of transferring the freight from the boat to the cars, he had as much oversight of one man as of another; and that he was on the boat a few minutes before the fire. And Henry testified that he was on the boat when fire broke out; and that there were at that time on the boat ten or twelve men of the boat and as many of the railroad.

It was admitted that part of the goods of the plaintiffs were stowed in the cars before the fire broke out; but there was controversy as to whether all of the rest, or, if not all, then what portion of the rest, had been unloaded from the boat; and much evidence was introduced on the subject. The plaintiffs contended that all their goods were in the actual or the constructive possession of the defendants so as to render the defendants liable for their loss; and the foregoing embraces the substance of the evidence which tended to prove that the defendants had received into their possession on board of the steamboat any of the goods of the plaintiffs. In the bill of exceptions on which the argument was had before the full court, such evidence was stated in detail.

The plaintiffs contended, as matter of law, "that under the arrangement and practice shown in evidence between the cor

porations forming the said line, the steamboat company were so far the agents of the defendants, or in partnership with them, that the defendants were liable for the goods destroyed on the steamboat, certainly after the arrival of the boat at the wharf and the men had actually begun upon and were engaged in removing the goods, as the evidence tended to show ; " but the judge ruled otherwise.

They then submitted certain prayers for instructions, some of which assumed, and others left to the jury to determine, that the defendants were liable for the goods of the plaintiffs, whethei burnt upon the boat or on shore. These also the judge refused ; and on the question of the delivery of the goods, and their receipt for transportation by the defendants, he instructed the jury as follows :

" The defendants, as common carriers, are liable for all goods destroyed by this accidental fire, which, when destroyed, had been received by them for transportation over their road. This would ordinarily be a question of fact, but on undisputed facts becomes a question of law. Upon the evidence, the defendants concede that in each action they are liable for all the goods belonging to either plaintiff, which at the time of the fire had been removed from the boat, whether at the moment of their destruction they were on the wharf, in the station, or in the cars. As to the goods remaining on the steamboat and there consumed by fire, they are not liable, with the following exception, to which the defendants assent : They are liable also for any goods which are proved to have been actually taken possession of on the steamboat by any of the servants or employees of the iailroad company, either by loading them on the trucks, or taking them by hand to carry on shore. For all goods consumed by fire on the boat under such circumstances, after such a delivery to the railroad company, it is liable ; but as to all other goods consumed upon the steamboat, the evidence is not sufficient to warrant the jury in finding that the railroad company had any such possession of them as to be liable as common carriers for their loss.

" The judge declined giving any instructions as to any join<sup>4</sup>

or mixed possession as between the railroad or boatmen, or as to any constructive possession by the defendants, other than as given above. At the close of the charge, the following additional request was made in writing, which he declined to give, saying that, as the evidence stood, (all of which was recited in the bill of exceptions,) he meant to be understood as ruling against the plaintiffs on that point, namely : That it is not necessary in order to constitute delivery, as in case of a lot of pails, or cans, or tubs of butter, forming one shipment, that the defendants' men should actually get them in hand on the boat; that is, in actual manual possession. It is enough if they had accepted the lot and taken general charge and begun to remove them."

The jury returned a verdict for the plaintiffs for a part only of their claim; and they alleged exceptions.

*A. A. Ranney & N. Morse,* for the plaintiffs.

*J. G. Abbott & W. G. Russell,* for the defendants.

HOAR, J. The rules of law which limit and fix the liability of successive carriers of goods over a continuous line of transportation have been recently very fully considered and stated in the case of *Darling* v. *Boston & Worcester Railroad Co.* 11 Allen, 295. The authorities were there reviewed to such an extent that we do not consider it necessary or expedient to examine them again in detail. It will be sufficient to refer to the rules which were adopted, and apply them to the decision of the case before us.

The defendants are proprietors of a railroad, connecting with a steamboat company at one end of their road, and with another railroad at the other end, the three forming a continuous line of transportation for passengers and freight between New York and Boston. A fixed price for freight was charged for the whole transportation between the two cities, each company receiving an agreed proportion for its share of the service. The goods which are the subject of the suits were received in New York by the steamboat company to be carried to Boston, and the whole freight bills were to be collected by the other railroad company on the delivery of the goods in Boston. No agree-

ment was proved at the trial by which the defendants had entered into any express contract by which they would be respon sible for anything beyond the safe carriage of the goods upon their own line. The defendants have not sued upon the contract for the entire transportation, nor claimed an interest in the entire freight; which distinguishes the case from *Fitchburg & Worcester Railroad Co.* v. *Hanna,* 6 Gray, 539. There was no general agreement between the three companies by which they were to share the proceeds of the whole business on all the lines; so that it is not within the principle laid down in *Champion* v. *Bostwick,* 18 Wend. 176. There is therefore nothing in the case, which, under the doctrines stated in *Darling* v. *Boston & Worcester Railroad Co.,* would create a partnership or joint liability between the defendants and the other companies composing the line.

It then only remains to determine to what extent the defend- ants were liable as common carriers for the goods of the plaintiffs which were destroyed by fire. The general rule is perfectly well settled, that the responsibility of a common carrier for goods commences when goods are delivered to and accepted by nim for the purpose of transportation. The defendants were therefore answerable only for such goods as they had actually received for the purpose of conveying in their cars. Story on Bailments, § 453. *Merritt* v. *Old Colony & Newport Railway Co.* 11 Allen, 80. When the facts are all found, the question what constitutes a delivery and acceptance is a question of law. And we think upon the uncontested evidence at the trial, there is no doubt that the instructions given to the jury were at least sufficiently favorable to the plaintiffs, and that they have therefore no ground of exception.

When goods are delivered by one carrier to another, it is evi- dent that the liability of the second commences only when that of the first terminates. If there be no relation of partnership between them, one cannot receive and accept the goods for transportation until the other has completed the delivery of them to him, and discharged himself from the custody or control of them. It was the duty of the steamboat company not only to

carry the goods safely on their boat, but to deliver them upon the wharf to the defendants. When they were placed upon the defendants' wharf, which was the defendants' place of deposit, the responsibility of the steamboat company ended, and that of the defendants began.

The peculiarity of the case is, that, as the goods were to be immediately loaded into the cars, it was more convenient that they should be transferred at once to the cars from the boat, and not put upon the wharf. Each company being interested in the dispatch of freight as easily and rapidly as possible, and each having men in their employment, the work could be more swiftly and conveniently performed by having the two sets of men act in concert, and each do a part of the work of the other. But we can see no evidence, from this arrangement, of any delivery of the goods from the steamboat until they reached the wharf. On the contrary, the fair and direct inference is, that the defendants' men, while on the boat, were merely assisting the steamboat's men in putting the goods ashore, who in return, when they went upon the wharf, repaid the service by carrying to the cars the goods which they had landed. But though the railroad men took the goods upon the trucks on the boat, they did not bring them into the possession of the railroad company till they reached the wharf. The taking of a part of a lot of goods, and the fact that the rest were pointed out and ready to be taken on the boat, constituted no constructive delivery of the whole. There was no single package which was not taken up, which might not as likely be taken by the men employed by the steamboat company as by those employed by the railroad. More was to be done by the steamboat company's men before the transfer was completed; the goods were still upon the boat; and the possession and consequent responsibility of the steamboat company was therefore not divested.

We are therefore all of opinion that no instructions which were asked, which assumed, or would have left it to the jury to find, that the defendants were liable for any packages which were destroyed upon the boat, were improperly refused; that the instructions given, if in any respect erroneous, were so be-

cause, being given with the consent of the defendants, they **were** too favorable to the plaintiffs; and that the

*Exceptions must be overruled.*