King, J.,
delivered the opinion of the court.
Appellees as plaintiffs helow brought suit against appellant alleging that on the 29th day of October, 1906, plaintiffs, the owners of 1,260 head of sheep, shipped said stock from Chama, New Mexico, over the road of The Denver and Bio Grande Railroad Company to Denver, Colorado, consigned to themeselves, and that these sheep, together with the way bills, were delivered to the defendant company at Denver on November 1st, 1906; that plaintiffs then and there requested defendant to forward said stock without delay to Giddings, a station on defendant’s railroad near Fort Collins; that defendant accepted the way bills, took the sheep into its possession, and agreed to make the shipment as requested ; that defendant failed to make prompt shipment, and kept the sheep in muddy, filthy and insufficient pens, with inadequate facilities for feeding, where the feed was trodden underfoot and wasted, so that the sheep received no benefit therefrom, and in which they were exposed to inclement weather, by reason of which 160 sheep, of the value of-$424, died, and the rest shrank in weight, and deteriorated in value to the amount of $125. Other damage was alleged but withdrawn from the jury.
Defendant pleaded (1) a general denial; (2) that the sheep were shipped to Denver, and there delivered to The Denver Union Stock Yard Company by which they were retained until November 4th, when they were received and loaded by the defendant, and shipped to Fort Collins; that the said *4 stock yard company was not an agent of the defendant ; that defendant had nothing to do with said sheep until received hy it on the 4th of November; that any delay in shipment was caused solely by the absolute inability of the defendant to procure' cars; (3) that the shipment named in the complaint was received by the defendant on November 4th, and transported under a certain written agreement known as a “Limited Liability Live Stock Contract,” entered into on said date between plaintiffs and defendant, by which plaintiffs’ claims were released and discharged.
The reply, after - denying other affirmative allegations of the answer, admitted the execution of the contract, but denied that the claim of plaintiffs in this case is controlled by said agreement, and sought to avoid the conditions set forth in the 13th, 15th and 21st paragraphs of said contract, by alleging that the written notice of loss required by paragraph 13, was given as soon as possible after learning the extent of the damage; that suit was begun within ninety days after the happening of the injury, as required by paragraph 15, and denying the waiver or release provided for in paragraph 21. Paragraphs 13 and 21 of said contract are as follows :
“13. All claims for loss or damage from any source shall be presented to the carrier within ten days ■ from the date of the. unloading of said stock at destination, and before said stock has been mingled with other stock; otherwise, such claims shall be deemed to be waived, and the carriers shall be discharged from liability.- Any carrier liable on *5 account of loss or damage to any of said stock, shall have the benefit of any insurance thereon.”
“21. As a further consideration for the reduced rate herein given, the shipper hereby releases and waives any and all causes of action for damages, or otherwise, by reason of any written or verbal contract for the shipment of said cattle, or any of them, prior to the execution hereof.”
The cause was tried to a jury upon instructions given by the court which practically eliminated the written contract from consideration, and denied its applicability to the cause of action, and placed the obligation, duty and liability of the defendant as at common law — that of practical insurer of the freight, after it was received and accepted by the defendant as a common carrier; and charged that in case the jury found that upon the day following the arrival of the sheep in Denver, the agent of The Denver and Bio Grande Railroad Company delivered to the defendant company the bills of lading of said sheep, and that the sheep were accepted by the defendant at the stockyards for shipment, and were at that time ready for shipment, the defendant must, in law, be deemed to have accepted and received the sheep on the day it received the way bills or bills of lading from The Denver and Bio Grande Bail-road Company; and further, in effect, that failure of plaintiffs to present claim for loss or damage within ten days from the unloading of the stock at its destination, as required by said paragraph 13, would not bar plaintiffs’ claim if the same was presented within a reasonable time after the amount of the loss had been ascertained, in case the jury should further find -that the lapse of time did not *6 prejudice the rights of the defendant. (Instruction No. 2.)
The grounds of error relied on in the briefs of counsel for appellant are as follows: 1. Appellees were not entitled to have the cause as made submitted to the jury, for the reason; (a) that appellant was not responsible nor liable for the condition of the stockyards; (b) appellees were precluded from asserting their claim, because made too late. 2. The court erred in the instructions given, namely, instructions 2, 3 and 4. 3. The court erred in refusing to give instructions requested by appellant. 4. The motion for a new trial was erroneously overruled.
The principal evidence upon the questions herein to be considered was given by F. F. Breniman, brother of one of the plaintiffs, who accompanied the shipment, and by T. J. Burns, agent at the union stockyards for the defendant company. The shipping contract between The Denver and Bio Grande Railroad Company, initial carrier, and the plaintiffs, was not in evidence. Breniman testified that the sheep were billed over the Denver and Bio Grande railroad from Chama, New Mexico, to Fort Collins, Colorado; that they arrived in Denver about eight o ’clock on the evening of October 31st; that he went to the office of the initial carrier to see if the sheep could be sent on immediately to Fort Collins, and was told by the agent of that company that they would be turned over to the defendant company; that said agent notified the defendant’s agent, who declined to receive the sheep that evening on board cars; (the reason, as admitted by counsel for both plaintiffs and defendant, being that the sheep *7 had been on board the cars at that time for twenty-eight hours without feed or water, and, under the federal statute, must be unloaded); that said sheep were sent to the Union Stockyards and unloaded. About ten o’clock November 1st witness went to the office of the defendant at the stockyards and asked the agent when the sheep would be shipped, the agent replying that he thought about five o’clock on that day. About five o’clock witness was told by said agent that they would go out on the ten o’clock train, and later, that they would go about twelve o’clock, then at three in the morning, and at this time witness was told to go to bed and he would be called. Next morning (Nov. 2) witness again saw the agent, who then told him that the sheep had not been loaded because the bills of lading had not) been turned over by The Denver and Bio Grande Railroad Company. Witness then got the agent of that company and accompanied him to the defendant’s office and found that the bills of lading had been delivered to and were in the hands of defendant’s agent, who then told witness that the sheep had not been billed out, and even if the bills were there, would not have been billed, because witness had not ordered the sheep loaded; that if no .one had been with the sheep they would have been shipped, but where they were accompanied it was expected-that the man in company would order them loaded; witness then ordered cars, and that the sheep be loaded ; admitted that he knew there was a general shortage of cars, but testified that nothing was said to him at that time about shortage, and he did not know there was a shortage for that shipment.
Burns, defendant's agent, could not remember *8 when the bills of lading were received by him from the initial carrier. He testified that it was not usual for the initial carrier to deliver bills of lading, but to give a transfer sheet, although sometimes ¿he receiving road would take the way bills in order to save time. His way bills showed that he had received the bills from the initial carrier; that shipment had been made over the Denver and Rio Grande from Chama, New Mexico, consigned to plaintiffs at Fort Collins with final destination at Omaha, under a through rate with “feed in transit” provisions, but not on a through contract. He testified that it was the custom of the yardmaster at the stockyards, upon arrival of stock billed to points beyond, to post a bulletin showing the fact of arrival, place of shipment, consignee, route and destination; that each road had its separate bulletin, and that he supposed such a bulletin was posted November 1st showing the shipment in question, and that he saw it; that the reason for delay in shipment was a shortage of cars, and the fact that plaintiffs ’ agent accompanying the sheep did not order them loaded. It was shown that several railroad companies, including the defendant and the initial carrier, had agencies and offices at the stockyards, and received and discharged live stock at that point; that there was a rush of business at that time,'and the stockyards were crowded; that the sheep were confined, without shelter, in open pens in cold and stormy weather, and the yards deep in mud without facilities for feeding; that upon arrival at Fort Collins 12 of the sheep were dead, and the others so weak that many of them had to be hauled to the feeding pens, and that.within a few days 160 of *9 them died and a number more later. The purpose of plaintiffs was to feed and fatten the sheep at Fort Collins before proceeding to the final destination named. The jury returned a verdict in favor of plaintiffs. '
1. In this state railroad companies are common carriers of live stock. — Railway Co. v. Rainey, 19 Colo., 225. “The general rule maintained by all the authorities is that carriers of live stock are liable absolutely for loss of or injury to stock intrusted to them for transportation, like other common carriers, unless the loss or injuries were occasioned by the act of God, or the public enemy, or the negligence of the shipper, except that they are not liable for loss or injury caused by the “proper vice” or natural propensities of the animals themselves, and not by any negligence on the part of the carriers.” — Moore on Carriers, p. 509; Railway Co. v. Rainey, supra. But, the authorities are uniform in holding that the carrier is not responsible, in that capacity, for goods, until they have been delivered to the carrier for immediate shipment, in condition for transportation, and requiring nothing further to be done by, and no further orders from, the consignor, and the goods have been so accepted by the carrier. — Elliot on Railroads, sec. 1409, 2nd ed.; Hutchinson on Carriers, sec. 113, 3rd ed.; Moore on Carriers, p. 133; 6 Cyc., p. 614. To effect such a delivery to the carrier there must be, either actually, or in legal effect, a complete surrender to it of possession and custody, and as a consequence, all control over the goods must be abandoned by the owner until the purpose of the bailment has been accomplished; and, until this has been done, it cannot be *10 said that the carrier has assumed any responsibility for the goods, as carrier. — Hutchinson on Carriers, sec. 72, 73, 1st ed.; Moore on Carriers, p. 133. The question of delivery and acceptance for immediate shipment does not seem to be controlled, nor to any considerable extent affected, by the fact that there may be, or is expected to be, some delay on the part of the carrier in placing the goods in transitu, unless for that reason the carrier declines to accept the goods for shipment until some future time, and thereby its liability, if any, becomes that of warehouseman instead of carrier. The rule in that respect seems to be fairly stated in Railway Co. v. Murphy, 60 Ark., 333, 338, quoted as authority by counsel for both plaintiffs and defendant, and being as follows:
“When the shipper surrenders the entire custody of his goods to the carrier for immediate transportation, and the carrier so accepts them, so instanti the liability of the common carrier commences. WThen this occurs the delivery is complete, and it matters not how long, or for what cause, the carrier may delay putting the goods in transitu; if a loss is sustained, not occasioned by the act of Grod, or the public enemy, the carrier is responsible. But, on the contrary, as there is no divided duty of safe keeping, and no apportionment, in the event of loss, between the owner and the carrier, the surrender of control over the goods by the shipper must be such as to give the carrier the unqualified right to put at once in itinere, and the carrier must have accepted them for that purpose.”
And also in Elliott on Railroads, sec. 1409, as follows:
*11 “Railroad companies are held to the liability of warehousemen, not to that of common carriers, for goods deposited with them otherwise than for immediate shipment. Thus, if the shipment is not to begin until further orders from the consignor, or something, has been done by him, the carrier’s liability attaches the instant, but not before, the orders have been given, or the something has been done. If, however, the delay in shipment is due, not to the request or default of the consignor, hut to the exigencies of the railroad company’s business or to its default, the carrier’s liability usually dates from the deposit and not from the commencement of the journey. Thus, where goods hearing the consignee’s name and address are delivered to a railroad company, without agreement to the contrary, the delivery is equivalent to an express order to ship immediately; and the fact that the consignee consents that they may wait in the freight house because the company has no car ready, will not relieve it from liability as an insurer. ’ ’
It has been held that whether freight has been delivered to a common carrier so as to fix its liability as such, is a mixed question of law and fact, and delivery may be shown by proving that the freight was sent to the place where the carrier was accustomed to receiving it, and that notice was duly given that it was there for transportation. — Elliott on Railroads, sec. 1413. And, that the liability of a common carrier begins with the actual delivery to it, or with such notification as, under the usages of business, constitutes a constructive delivery. — Id., secs. 1443, 1412. And when the owner of the goods has done all in his power, and all that he is required *12 to do by Ms understanding with the carrier, or the usages of the business, to further the shipment, it then becomes the duty of the carrier to do whatever else is necessary to put the goods in transitu, and the delivery and acceptance will be considered as complete from the time the carrier is informed that the goods are ready for it. — Hutchinson on Carriers, sec. 125; Elliott on Railroads, sec. 1404; Illinois Central Ry. Co. v. Smyser & Co., 38 Ill., 354. And, that no formal acceptance is necessary. — Elliott on Railroads, sec. 1404, and cases cited. It is also held in Houston etc. Ry. Co. v. Hodde, 42 Tex., 467, that delivery is a question of fact for the jury. But in Gass et al. v. N. Y. etc. R. R. Co., 99 Mass., 220, 96 Am. Dec., 742, it is said that delivery is a question of law where there is no dispute as to the facts.
A railroad company, as a carrier of live stock, is obliged to provide suitable and necessary means and facilities, such as good and sufficient stock pens and yards for receiving, loading and unloading live stock offered it for shipment, and for its delivery to the consignee, and for stock unloaded en route to be fed, or on account of delay, and is liable for damages caused to said stock by reason of the carrier’s failure to provide such facilities. — Moore on Carriers, p. 500; Covington Stock Yards Co. v. Keith, 139 U. S., 128; International etc. R. Co. v. McRae, 82 Tex., 614; Feinberg v. Delaware etc. R. Co., 45 Am. & Eng. R. Cas., 348; Hutchinson on Carriers, secs. 634, 638, 3rd ed.
II. Counsel for appellant in their brief say:
“If there are cases in the books involving identically the same questions as are involved in the case at bar, we have been unable to find them.” The *13 statement of counsel as to the absence of cases directly in point is confirmed by our own examination to the extent that we find few, if any, cases in which the liability of the connecting carrier has been based upon a delivery by the initial carrier, or the consignor, to a stockyard company, a corporation separate and distinct from the carriers or either of them, and which was the owner and in sole control of the pens and other facilities for feeding and discharging shipments of live stock. There are cases, however, which, from similarity of conditions involved, and by analogy, throw some light upon the subject. • — Covington Stock Yards Co. v. Keith et al., supra; N. Pennsylvania R. Co. v. Commercial Bank of Chicago, 123 U. S., 727. In the first case, the United States supreme court by Harlan, Justice, holds that a railroad company, holding itself out as a carrier of live stock, is under legal obligations arising out of the nature of its employment to provide suitable and necessary means and facilities for receiving live stock offered to it for shipment over its .road and connections, as well as for discharging such stock after it reaches the place to which it is consigned; that such duty cannot be efficiently fulfilled in a town or city without the aid of yards, in which the stock offered for shipment can be received and handled with care; and, that the rights and obligations of the parties are not different, whether the railroad company itself maintains the stockyards, or employs another company or corporation to supply the facilities for receiving and delivering live stock, which the railroad company was under obligations to the public to furnish.-
*14 Upon the question of delivery the court, at the request of appellant, instructed the jury that if the stockyards where the sheep were held prior to shipment, “were not owned, controlled or. operated by defendant, and were not furnished to plaintiffs by defendant, and that said stock was not accepted by defendant for shipment until the cars were furnished in which the sheep, were loaded and shipped,” under the issues, their verdict must be for the defendant; and also that mere delivery to the stockyards at Denver, by The Denver and Eio Grande Eailroad Company, or its agent, was not delivery to the defendant. The evidence as to the relations between the stockyards, or the stock yard company, and the carriers, is somewhat vague, but seems to establish the fact that the stockyards was a common point used by railroad companies in Denver for delivery of stock, receipt of stock, and exchange thereof between the railroads terminating in Denver and connecting roads beyond that point, and that the pens and sheds in said yards were used by the railroad companies for the feeding of stock in transit, and it doés not appear that any other pens or shed's or facilities, for loading, unloading, delivering or receiving, watering or feeding stock were at that time furnished or supplied by such carriers in the city of Denver. Therefore, there appears to have been competent evidence, legally sufficient, upon which the jury might find that the pens in which the stock was kept, were furnished by the defendant to plaintiffs, or, were by selection and adoption, a part of defendant’s system for shipping live stock; and, that in accordance with usag’e and customs of the business at that place, the sheep were delivered to *15 and accepted by the defendant for immediate shipment on the first day of November.
III. Plaintiffs’ right to a recovery cannot be determined by the provisions of the limited liability contract, for the reason that the contract was not entered into, nor mentioned, until the fourth day of November, whereas, the alleged acts or default of defendant by which the injuries complained of were caused, occurred between the morning of November 1st and the afternoon of November 4th when the contract was signed, and there is nothing to show that the contract was, or was intended to be, retrospective in its effect, unless it be paragraph 21, which is ineffective under the circumstances. Instruction No. 2, upon the question of notice, seems to have been a partial recognition by the court of some effect to be given to the written contract.. But, if the giving of that instruction was error, such error was in favor of the defendant. It would be unreasonable to hold that paragraph 13 of the contract had in contemplation notice to be given of loss or damage sustained prior to the time the contract was signed. The provisions of paragraph 21, waiving and releasing all causes of action under any prior verbal or written contract, upon respectable authority, were void. The supreme court of Arkansas in Missouri & N. A. R. Co. v. Sneed, 85 Ark., 293, held that it was not error in the trial court to exclude from the jury that clause of the contract which required plaintiff to give notice of damage before removal of the stock, where, as in the present case, the damage had already occurred when the contract was executed; that where the damage to the stock occurred before the contract was entered into, such *16 contract had no bearing upon the case, and that defendant had no right, at the time of shipment, to impose upon the shipper a contract for exemption from liability for damages which had already occurred, and cited Railway Co. v. Burgin, 83 Ark., 502, and Railway Co. v. Pearce, 82 Ark., 353, in which it was held not only that a contract made after damage occurred had no bearing upon the case, but that a contract exempting the carrier from liability for damages which had already.occurred, was void, because unreasonable and discriminatory.
Excluding the written contract, the vital question became one of fact, namely: Were the sheep delivered to and accepted by the defendant on the first day of November for immediate shipment? If they were so received, the shortage of cars, as well as the relations thereafter existing between the stockyard company and the defendant, were immaterial, as the defendant was then charged with custody and care of the stock, and was liable for any damage thereto not within the exceptions hereinbefore noted. The question of delivery and acceptance was submitted to the jury upon what appear to be appropriate instructions; and, we cannot say that the evidence introduced, viewed in its most favorable light to plaintiffs, was insufficient to justify a finding in their favor. Therefore, the verdict of the jury in that respect is binding upon this court.
IV. After verdict, application was made by the defendant for a new trial, on the ground of newly discovered evidence, claiming that the written contract of shipment under which the sheep were hauled by The Denver and Rio Grande Railroad Company from Chama, New Mexico, to Denver, did not re *17 quire delivery to the defendant, and contained no reference to shipment to any point beyond Denver, except Chicago, nor to any shipment over defendant’s line; that the transfer sheet from The Denver and Rio Grande Railroad Company to the defendant shows that said transfer could not have been delivered to the defendant company until after the sheep had been long confined in the pens, and the damage complained of had already been sustained. The motion is supported by affidavits of counsel and others showing that they had no copy of the contract of shipment between The Denver and Rio Grande Railroad Company and plaintiffs, and did not demand one for the reason that they thought it was a part of plaintiffs’ case, and that.they were surprised in the action of the court in giving Instruction No. 3 to the jury, charging that The Denver and Rio Grande Railroad Company was the agent of plaintiffs ; that since the trial counsel had caused search to be made among the files of said company and had found carbon copies of the contract and transfer sheet. The affidavits do not contain a copy of the alleged shipping contract with The Denver and Rio Grande Railroad Company, nor set forth its substance; therefore, neither the trial court nor this court has been informed as to what effect, if any, the written contract, if in evidence, might have. Counsel’s affidavit fails to show diligent effort to secure this evidence, which it seems ordinary caution would have required them to investigate prior to or during the trial. _ The motion was denied, and we see no reason for holding that in such ruling the court abused its discretion.
*18 Decided April 8, A. D. 1912.
Rehearing denied June 10, A. D. 1912.
The record being free from substantial error, the judgment will be affirmed.

Affirmed.